All right. The next case on the docket is Henry Estate of, you may be mispronouncing this, Weiland, W-E-I-L-A-N-D, 5-11-104. The parties are present. And Mr. Turner, you may proceed. I'm here for the appellate. Thank you, Your Honor. Please forward the counsel. And I do believe the pronunciation is correct. As good as I can do, anyway. I want to, I guess, get a little bit of history on this. This case started out with the death of Darrell Weiland, who died in February of 2007. Immediately on his death, and very shortly thereafter, an estate was opened. In order to accomplish that, there were some things that had to be done, obviously. Petition for probate of will, the letter's testamentary had to be prepared. One was, in this case, it's a two-page document. In addition to that, there was an affidavit regarding an airship. And that was a two-page document. There was an open bond, which is a one-page document. An order declaring an airship, which is a one-page document. An order admitting that will, which is a one-page document. Letters of office. Proof of mailing various things. Then there would have been a notice of rights to parties during independent administration. And all of those are statutory. What we're talking about here is a list of items. And if you look at the petition for probate of will, the letter's testamentary, if you've got that filled out, you virtually have all of the information you need to do all of the other documents necessary to get the estate open. Now, admittedly, you're going to have to cut and paste the style of the case. And you're going to have to say these are the heirs, these are the legatees, these are people I know. And they estimated the value of personal property to be $100,000. That said, they didn't know about real estate, period. This took 6.8 hours to prepare those documents by the secretary. That's in addition to 2.7 hours that Mr. Dronenbill was visiting with or having a conference with the proposed executor in supposedly getting this information and reviewing those things. Distilled to its finest, Mr. Turner, your complaint is about charging for the secretary's time. Yes, sir. Yes. I mean, a competent secretary could have prepared those documents in an hour and a half, having the information necessary to do so. I could do it in an hour and a half. Let me ask a question then. Is your concern charging for the secretary's time at all? Or is it that the secretary's used too much time? They are. There is nothing special about the services rendered by these people. If it takes 6.8 hours for those people to do that, they shouldn't be a secretary in the long run. They shouldn't be a secretary anywhere. And the law is that normally when you bill $175 an hour, $200, $150, whatever it is, that that includes your overhead, ordinary telephone, ordinary stamps and envelopes and postage and secretarial staff. It's been a while since I've engaged in the practice of law. But is there anything in this record that says that it's now a common practice or accepted or normal to charge for your secretary's time? No. There is none. And is there anything in the record that sets out any particular qualifications or training or education of these secretaries that would render them a higher level than the average legal secretary? There was testimony that they go to tax school every year. At least a couple of days they go to tax school. But does that render them especially effective or especially valuable? They're not paralegals or anything like that? No. There was no claim to how far they went to school. We don't know if they finished high school or whether they finished college. We don't know how much they got paid. Mr. Drum says he doesn't know how much they got paid. Now, he may have surmised that they got $20 an hour, but he doesn't know that. There's nothing on the record to show it. All through the transcript and all through the testimony, he testifies that these folks are being his employees. He never indicated they weren't there any longer. Now, I do know that in his reply to me, he says there's no evidence to suggest that they worked there. While if you look at the documents, one of them signed on the proof of service or mailing or a notary, something on one of the pleadings filed here. Did the heirs bring this objection about the secretarial fees to the attention of the court in any way? Yes, we filed an objection, a detailed objection. And was there evidence then that the heirs called the secretaries to confirm that they actually spent all this time and this was a normal fee for this type of a case? I may not understand the question. Well, was there anything that supported the heirs' complaint that the secretarial fees should not have been charged? Did the trial court hear the heirs' objection? Well, my position is that when an attorney goes to court and says I want to be paid for my services and for my cost and what I have in this case, it's his burden to prove those. There's nothing in the record that suggests that these folks should be getting what another attorney in his office charges. And the only expertise they appear to have, if expertise is the correct word, would be in regard to tax matters. And if you look at the taxes that they handled, 2006 payable, 2007, they charged 13.8 hours to prepare returns. Now, I can understand maybe that first year not having some familiarity with the case or the deceit or the tax matters, that it may cost a little bit. But that was $2,070 that they billed, $150 an hour. The executive claims another half of that, which brings the total cost of the 2007 at $3,105 to get the returns prepared by nonparameters, somebody that's gone to a two-day tax school. Let me just ask one other question just to make sure I'm not missing a point here. There's no claim that this $150 was going to go to the secretary. It was going to Mr. Jones' firm. Right. They were making $130, $140 an hour off every hour they spent. There was clearly no incentive for them to rein them in because they could always hire another person, a warm body to come in and do this. If we look at the taxes, I want to go back to that just for a minute. Now, in 2007, paid in 2008, when they did that, through the whole year, virtually since February, Mr. Jones' firms have been involved. They handled everything. Every check that went out, every item that came in, they got it. They billed as they came in. And that year, they charged $15.7 hours to do the income tax returns. And with Winslow ahead, on comes the $3,005, $3,350. Now, those folks never came in here to explain what their bills are and what the items are. For instance, copy returns, preparing for checks to pay taxes, conferences with Mick. They just go on. And there may be numerous other items in there, so you can't really tell exactly what they charged for and what they were doing at the time. Wouldn't it have been prudent for the heirs to file an objection to the final report? You mean in 2007? Yes. Well, in 2007, there was a tendered final report, but it was not filed, I believe. Judge, I believe it was offered to them, saying, hey, if you'll pay up, you'll come up with the money, here's what we're going to do. We want to do it before the end of the year. They were about $200 short of having enough funds to pay all of those attorneys' fees at $27,000 in the first 10 months of the year. If you look at the inventory matters, and if you look at the inventory, it's simply a list of what they already knew because it went through the auction. They didn't identify things. Two or three of the pages of the inventory simply says there was a retirement fund, it's not a part of the estate. That didn't take anything. There were three legal descriptions that fit on a page. The secretarial staff charged thousands of dollars to accomplish that inventory. It cost $3,720. If you look at what they billed for, and if you look at what they billed for, here's 6.1 hours on 5-15-2007, LAS. That's misstated. It says work on real estate inventory regarding real estate and other assets caused to wincel regarding payoff mortgage. On the same day, Sandra Meares billed 6.1 hours for work on real estate inventory regarding real estate and other assets caused to wincel regarding payoff mortgage. And that payoff mortgage, I think, was the mortgage that he owed to the estate. But you can't tell exactly what they did, but there's 12.2 hours of identical time by two people addressing, supposedly, an inventory that amounts to nearly nothing. And then when you add the whole amount, it's 24.8 hours. That includes some other things, but the court never heard what those were. Most people never testified why it would take them that long to do it or how it could possibly take any competent person that long to do it. And if they did, why they should be paid for it. Then on top of that, the executor's going to get another 50%. That brings the cost of that inventory to $5,580. While there's been a lot of talk about animosity between the parties, there is nothing to suggest animosity had anything to do with this or with the preparation of the initial pleadings in the case or the tax documents. I did misstate something earlier, that there was a claim for some chickens. A pair of her owed money that was not being paid to a bank. She had a claim for $42 for the chickens. Mr. Drone's firm undertook, it looks like, to represent her because they prepared an estate claim for her against the estate, charged three-tenths of an hour to be $45. Then they checked with the bank shortly after that about the vehicle. She wasn't keeping the, I think, the insurance up on it. And then they paid her $42, and that cost them about $202 to help her out, to have her file a claim. If she wanted to file a claim, she could. There is no reason at all for them to spend $202.50, that's executor's fees and everything, to file a claim against the estate of the deceased. In fact, if they thought it was due and fair, they could have written her a check for $42 and had her give them the receipt. You don't have to have a formal claim filed. The other thing is when you look at all of the billing made by the secretarial staff, that billing may be to walk to the bank, to walk here, make a coffee. It may be any number of things that requires no skill. And none of the things that are reported there reflect their activities were a result of any animosity or misdeeds by any of the heirs. I don't know why they weren't called by Mr. Drone to come in and show some expertise, to explain what they did. There are no accusations to the point that you can tell what was spent for a particular item. The court had no way to ascertain what that was. It's the burden of the estate to support their charges. Absolutely. Did Mr. Drone testify or file an affidavit, or did any attorney say it's a normal thing in the regular course of business in law offices these days to charge for secretarial time? No. What he did, he testified that in his business, in his location, in his firm, it has been the custom. But that's not what the custom is in the community, in the legal community. Well, do we have anything in the record either way on what the custom is in the legal community? No, no. I mean, just the way it's set in case law, you know, where it says it's inappropriate to do that. Now, I would understand if this were a situation where he had to devote, you know, maybe he had to make 2,000 copies of something and had to devote a secretary to do that. Maybe he'd want to build up her time standing there and running these through Koehling and doing what he had to do because that was dedication of that for a particular extended purpose. And I think that might be a question. The only case I can recollect that there was a case, I think it was in Chicago, where there was a secretary of paralegal, I think, billing maybe $80 an hour. They charged her a raise. And they thought that was appropriate because she assisted the lawyer in the courtroom and her – obviously in the courtroom she was devoted entirely to that one enterprise. And that might be appropriate. And maybe if they had billed something that wouldn't have been so extreme, it would have made some difference. I don't think they're entitled to bill for that period. I can't imagine a situation where a lawyer can say I'm paying my secretary $8.50 in a minimum because that's the law. I'm providing insurance on some of them. And I don't know what I'm paying them otherwise. Maybe more, maybe no less than that. But I'm charging this estate $150 an hour. And I'm charging the estate $150 for a duly licensed attorney, Mr. McCarthy. There's something terribly wrong about that. And then to say that we can do that and the executor is entitled to recoup 50% of the total of all this mess, well, that's, I think, the definition of manifest error. I just think there is no way around it. I don't think you need a case to point this out. I'm embarrassed to be here, but more embarrassed because I feel like I need to be here to argue this case. What the executor didn't keep a record of. His function was nothing more than a courier in most instances. If he got a bill in, he would drive it up there, hand it to them, they'd charge for it, they'd pay, he'd sign the check, and he'd go home. If he got another bill the next day, he'd drive back. And then the executor could not identify what time he spent. He couldn't break it down, and he couldn't show the benefit. One thing, one area where it really stands out is the executor says, well, I went to check on the crops where the farm tenant was. I see he got a plan of how they were doing, check on them, see them, make sure they haven't harvested this, that, and the other. Well, that farm tenant, Kent Williams, was a farm tenant who was in business with the executor, with whom the executor and him had an obligation of a million and a half dollars in debt, that Kent Williams testified that the proceeds from these crops went to apply to the debt that was jointly owned between the two of them, and this was a cash lease. The executor had no concerns as to whether or not the crops were good, whether they were planted, or if the guy just rented the land from them. There was no reason for him to go out there and build time to feather his own nest and to make sure that his debt, the 150 or 1.5 million, is reduced. The other thing is that before this land was leased out to the tenant, there was two to three times as much work and line done on this piece of property as had been the custom, according to the person who did the line work on the farm, and that was land that went into this farm tenant. There was tiling that was done. This was land that the farm tenant would be farming. They took out about five and a half acres, I think, out of the CRP and cost $11,000, and that is farmland that the tenant farmer would be farming. I can't get into everything here, but when you look at this record, and if you just read through it, what did this person do this day, and why did it cost or why should it cost $150 now? A bank statement comes in, and you can look at the inventory, you can look at the accounting. They billed for a bank statement coming in, and the secretary put it in a box, and it cost $15, a tenth of an hour, and that's it. There's no activity at all. It doesn't take reconciliation to say nothing happened. There's testimony that when the states open, they open files, and they designate what these files are, and the secretaries charge $150 to type labels and stick them on folders. They charge $150 an hour from the secretaries to keep a calendar so that the attorney knows when things are coming up. I don't have anything else to say. I just think it's wrong, and I think it's embarrassing, and I think it opens the door to abuse, and I think that is one of the primary reasons that lawyers are confronted. Let me ask you one final thing. You're not contending that the attorney time is in question. It's the secretarial time and the executor time. The time that Mr. Drone applied in this case that he billed for was time that I think would have been reasonable under the circumstances for what he did, and the time that he put into it was the time that clearly addressed the issues raised by the controversies between the parties and the animosity, not what the secretaries did. We do believe, however, that because this estate went on beyond December 2007, there shouldn't be any fees after that point because the only people that benefited were the attorney and the executor, maybe the secretaries, and after that point, because of the excessive billing by the secretaries, it had to go forward. They had to ask for more fees. They had to sell things. They had to do this at the end. Had they not billed for the secretaries as they did, there would have been ample funds to close the estate in December 2007, and there would have been a surplus. Okay, Mr. Turner, you'll have an opportunity for a rebuttal. Mr. Drone. Good morning. May it please the Court. I am Michael Drone. I represent the executor of this estate. I'm here to defend on appeal Judge Stanley's well-reasoned and solid order that was entered in this case on February 17, 2011. In fact, Judge Stanley made a docket entry on April 7 that he directed the executor to defend on appeal this order, so I'm here to defend that appeal. Much time has been devoted in the brief and argument about the fact that my staff didn't come and testify in court. This is an argument they made to the court. It's an inference that the court was free to accept or reject, and the court properly considered the evidence. The court got to hear my testimony, got to hear the qualifications of myself and my staff and how our office is run. I think it's just a subterfuge for the fact that they didn't present any evidence except for about 15 minutes of Jerry Weiland testifying in court on the last day. Jerry Weiland didn't testify at all. They didn't have any witnesses. Mr. Drone, let me just kind of get to the chase here on the very uncomfortable part of this for me. How do you justify billing $150 an hour for your secretary's time? The fees were set. I'm not trying to avoid the question, but this is the point. Judge, they have focused on only one thing, the time spent in the charge. Judge Stanley, in his order, cited the factors that a court considers in setting the fee for an estate. He listed those factors. He discussed those in his order. He discussed the size of the estate, the work performed, the skill that it was performed with. He also specifically went on to say that the work was more difficult due to all the conflict and interference by the objectors. And they pointed out that the attorney, me, I was successful in all pleadings and contests. I didn't ask the court to set a fee per hour for anyone. The court set the fee based on the totality of the case, on the totality of the circumstances. Okay, wait a minute. You must have come in and presented timesheets. We presented timesheets. And those were timesheets kept by the secretary? Yes, showing the timesheets. And those timesheets included $150 an hour per secretarial time? Those timesheets showed the time the secretary spent. They did not show the rate. We had a contract, a fee-bringing with the executor where we told the executor how we charged. That fee-bringing is not binding on the court. I understand all that, but I'm just, where did the number come from? Okay. And the number that the court ultimately awarded was a number that included $150 an hour per secretarial time. You can't tell from the order. He made the award based upon the work. Well, you submitted it. I testified as to the hour spent, as to what time I customarily charge, as to how our office does the work. It's done under my supervision. Sure. I do not double bill for anything. When they show time for pleadings, the secretaries did, I review each of those pleadings. I check them, proofread them. They get redone if necessary. I do not double bill. You don't bill anything? No, sir. Unless I meet separately with the client. And is that all made of record? Yes. That you didn't bill for any of the pleadings, only the secretary at the time? Yes. The time I spent with the executor in discussion was billed. I bill when I tell them to do a letter. I review the letter. I sign the letter. I tell them what to put in the letter. They bill with their time at a lower rate. And I just have to confess, I've never heard of anybody billing $150 an hour for their secretaries. I'm troubled by that, and that's why I'm asking you this. I don't bill for my time. You didn't bill for $150. The court set the secretaries at $150. Is that correct? No, the court didn't set anybody's rate at anything. The court gave a general verdict for attorney's fees and costs. Does that verdict match what you submitted as your billings, including the $150 an hour verdict? Exactly, no. How close are we talking about that? To $3,000, maybe. Usually an appeal on attorney's fees is by the attorney coming in complaining he didn't get enough. And the appellate courts routinely and rightly recite that the trial court's decision should be upheld because the state of the fees is peculiarly within the discretion of the trial court and should not be set aside unless it's manifestly or palpably erroneous. When you look at it, if we hadn't had all this contention, our fees would have been half, maybe less than that. Most of my time was spent going to court, fighting or defending the executor against these outrageous claims that they would make, pleadings they would file, then dismiss, then a few months later refile, similar set of pleadings, then dismiss. Each time you have to file a response, you have to get ready, you have to go to court. 90% of my time billed on this was simply dealing with the obstructionist tactics that the objectors put into place. If you strip out my time and pay me only for that, then Congressman Young has paid practically nothing for administering an estate of $900,000 with the complications that involve multiple tax returns. Now testify to the qualifications of our staff. Sandy Mears has been with us over 40 years. She does federal and state tax returns, gift tax returns, fiduciary tax returns, income tax returns. She is more qualified than any attorney in Carmine. I decided myself to do that. Leanne Staley, she was with us. They're not with us anymore. She was with us for 10 years, and she worked at the bank before that. They were trained under Ivan Elliot, Jr. He trained me, and I continue to train him. Just because you have an efficient office and staff doesn't mean you should be punished for being able to do this work. The objectors don't want to give the executor anything. They say he doesn't get anything, and that's just more evidence of the animosity in this case. The trial court noted the trial's executor was able to testify as to all the time and effort spent by him in handling the affairs of the estate. And the court also noted that his job is more difficult because of the actions of the objectors. If you read the record, I spent several hours on the stand testifying. The executor spent several hours on the stand testifying as to all the work that went into this estate. It's in the record. We did make a record on this. Let me clarify something because I believe you said that you did not bill your secretaries at $150 an hour. No. I said the court did not base the fee. Oh, so you did bill it at $150. When we submitted the fee petition, we totaled that up as to time, and yes, that was the total. But again, the trial court is free to set a fee that the trial court thinks is reasonable based on those six facts. I'm not quibbling about that point. I understand that point. But I think in Mr. Turner's brief, he points out that it was over $16,000 of secretarial time was billed at $150 an hour. Do you agree with that? I don't. I didn't go and add the numbers. I don't know. And the total fee awarded was how much? $30,000. Well, again, with fee and cost, it was a general verdict for fee and cost, and we got several hundred dollars of cost advance if they even objected that. Did the executor file any kind of itemization of his time, or was it as the objectors contend, about half the attorneys? That was the fee that we suggested to the court would be appropriate. We told the court that that was one way that we would routinely advise executors if we think that's a reasonable fee. The court, again, set the fee less than half what our fee was. He said it based upon the testimony of the executor. And I think that the trial court is the one out there in the trenches doing the work, hearing the evidence, judging the credibility of the witness. He knows the states. He's handled the states. He's ruled on the states. And hopefully the trial court did not abuse his discretion. This is a reasonable fee in view of all of the facts and circumstances. Let me make sure I understand it. As far as the executor's fee, you indicated that your office, you suggested to the court a reasonable fee would be half the attorney's fees. And is there any case law to support that? No. In other words, that's not one of the factors that set out a case law for the court to consider in determining the executor's fee. It's supposed to be the work involved, the time, all those kinds of things. Well, there are fee schedules out there. Judge Hunter, in his handbook on that state administration, has an executor's fee schedule for the executor's fee. And in this case it would have been more than what the court allowed. Some of us have been around long enough to remember the old 1968 ISBA probate fee schedule that can't be used. And our fee would have been in line with that. The court considered the fee schedule, and we don't routinely charge by fee schedule, but I believe our fees. When you consider the additional litigation and all the extra work caused by the objectors, if you look at the online bar scale, we've been in line with that. They claimed that the estate broke out too long. In December 7th, this case, this estate was ready to close. What happened? The objectors switched attorneys right at the end of December. Then they went to Mr. Olson. Then they got a new attorney, Mr. Sharp. He immediately files a motion for additional time to review the files. Nothing happens. In May of 2008, he withdraws. So from December 8th, they were between attorneys. You can't go into court and get an estate closed over objection in the court. The only way that estate could have been closed was if they had approved everything. And it's clear now they weren't about to approve anything that anyone did in this estate. So in 2008, in April, we've got to pay the income taxes. And we've also got this unpaid bequest to St. Polycarp Church. Supposedly, Jerry Weiland has given them a check. Then he says, oh, hold the check. I don't want you to spend that money. I need it for my attorney's fees. So we've got an unpaid bequest a year after the decedent has died nearly. And so the estate pays that. There's the cash. The estate is, again, cash poor. So we have to keep it. And they're unrepresented. And so the estate goes on. We're trying to make money off the cash rent and other money coming in to build up enough cash to pay these fees and close the estate. I think that the objectors do not accept any responsibility for the fact that this estate went on so long and the cost has gone up so high. And much of it is Judge Stanley noted in his opinion. And as I've noted in the briefs we filed at the trial court and in our appellate brief, they litigate things they've done to obstruct and run up the expense on this estate. And yet they think they're blameless. Sherry Weiland's got an email that says mine and Jerry's behavior is not addressed in probate law. Well, there are consequences to their actions because I spent a lot of time responding to things that they filed that never went anywhere. So we're asking you, our fees and the fees of the executor are first-class claims. We haven't been paid a dime since this estate was opened in 2007. It's going to be coming on in five years. We're asking that you would affirm Judge Stanley's decision and not justify the behavior of the objectors by reducing the fees because that just proves to them that all these things they did to obstruct the estate, you can do that and get away with it. You can act with impunity. A couple of housekeeping things. This order appealed from is February 17th of 2011. The objectors in all their pleadings keep referring to February 14th. I don't know where they get that name, but the actual order is February 17th. The other thing is that Sherry Weiland's name is S-H-A-R-O-N. They repeatedly, Mr. Turner's brief spelled S-H-A-R-R-O-N. It is misspelled and should be correctly spelled in the opinion. Also note that Sherry Weiland often and deliberately misspelled my name, and I know that people don't like that, so I'm sure she's not going to be happy if her name is misspelled in your opinion. Anyway, I hope that the court will see that the trial court, this court will see that the trial court had all the facts necessary to make a proper determination of fees. You don't focus in on one aspect. You look at all the aspects. In the court, Judge Stanley considered all of the factors that ought to be considered, and all those factors, when considered, point to only one conclusion, that his decision is not manifestly or palpably erroneous and should be affirmed on appeal. Thank you. Thank you, Mr. Drone. Rebuttal? Thank you. Let me ask you a question right off the bat, Mr. Turner. Mr. Drone says forget about the $150 an hour for secretarial time. The trial court looked at the big picture, considered all the work that was done, and determined here's what a reasonable fee is for this case. It doesn't matter who billed or whatever, this is a reasonable fee. Why shouldn't we do that? Well, because you have to look at what they actually billed for, Your Honor. Robert Michael Drone billed 37 hours as of 12-19-2007. That's on page A34 of the appendix. Let me ask another question then before you go beyond that. Mr. Drone says when they bill for the secretarial time, doing pleadings or whatever, he doesn't bill anything. Whereas maybe in your office, when my office may have one, the secretary gets it prepared, I bill the time for those pleadings or whatever. So, I mean, he shouldn't get nothing for preparation of those pleadings. Do you agree with that? Well, he billed 2.7 hours for getting the information and reviewing the pleadings to open the estate. This is the time she'd say review the pleadings? Yes. Okay, so there was something billed for that. Yeah. That's, I don't know exactly what page that's on, but it is in here, where he met the 2.7 hours. And if you look at page 34 of the appendix again, it shows Sam Ramirez, 12.3 hours, $150 an hour. Leanne Staley, 73.3 hours at $150 an hour. And Vicki Hawk, 3.5 hours at $150 an hour. That was almost 90 hours expended on this estate for routine matters. And what you have to look at is when you go through the building and you go through the file, you will notice that the matters handled by the secretaries did not appear to have anything to do with the animosity, or what they call the trouble. We're not complaining about Mr. Groves' bill in 2007 up through December, because he addressed those things, and there were pleadings he prepared. He went to court. He handled those things. And when you look at it, how much was handled? There were some things done, but there wasn't any real trial. It was a three-and-a-half-hour bill on one day for attendance at court, I believe. But he billed those things. That's what the judge entered as part of what the record was. This was back then. That doesn't include the other fees that accumulated after that. And when he says that you don't want to control the activities and conduct of the heirs, you know, maybe that's true. But are you going to punish them by saying you did some things that caused Mr. Groves to spend part of the 37 hours, so we're going to make you pay $150 an hour? We're going to make you pay $5,000 for an inventory that could be drafted by anybody doing the research at $150 an hour in a day's time? We're not talking about things where you look at these and say, geez, that looked tough. You go to the tax office and say, what taxes are billed to Mr. Wyden? You find out, you go to the county clerk's office, you would. They spent two people at 6.1 hours each on the same day apparently doing exactly the same task, and that was only a part of the 24 hours plus it took to do the inventory. What we're saying is that the things they did were routine office matters, and maybe you ought to get something for it, but he should have billed, should have shown what it was, and it should be conglomerated into a list of items by these people so that you can't tell exactly what was done, when it was done, when you're charging for secretarial staff at a rate of $150 an hour. There's no justification for it. The fact that Jerry and Sherry took the stand and didn't testify very long has nothing to do with what their fees were. He's saying, I want to get paid for 37 hours in December. We're saying, okay, get paid. They're saying we want another 90 hours, roughly 90 hours, $150, $13,000 something at that point in time for secretarial staff in receiving mail, keeping a calendar, putting stickers on folders in a box, maintaining these things, the things that anybody else has their secretary do. I'm having a little difficulty finding it. When did the $150 per hour first appear? Did the judge bring that up out of the blue, or did somebody testify? That's just what they do. There was an initial bill for $150 an hour. A34 is the billing statement they made, and that's where I was reading from. Okay, so it didn't come up, the judge didn't put it there. The judge didn't have anything to do with that. Okay. And when he says that they should have been – here's what he says. He was arguing just a minute ago. They could have accepted this and it would have been over in December. Well, sure they could have. They could have agreed to pay $13,000 for secretarial staff and put a kickstarter in the pot and they could have settled it. But are they supposed to? Thank you. All right. Thank you both for your briefs and your arguments. Appreciate your time and effort. We're going to take this matter under advisement and render a decision in due course.